## Case No. 6,291.

### The H. B. FOSTER.

[3 Ware, 165.] [1]

District Court. D. Massachusetts. July, 1858.

HIRE OF VESSEL ON SHARES — LIABILITY OF VESSEL FOR SUPPLIES AND REPAIRS.

1. In a contract for the hire of a vessel on shares, that is, the hirer to victual, man, have the control of the vessel, and pay over to the proprietors a certain proportion of the net earnings as charter or hire, the general owners are not responsible for supplies or repairs furnished in a foreign port.

2. But the vessel is liable whether the hirer navigate her himself or employ another master.

3. Every person who furnishes such supplies or repairs to a foreign vessel is, by the maritime

---

[1] [Reported by George F. Emery, Esq.]

law, considered as contracting with the vessel herself as a principal debtor, as well as with the master and owners.

[Cited in The Queen of the Pacific, 61 Fed. 215, 216.]

4. The natural and legal presumption in such a case is that the creditor looks to the vessel as one of his securities, because no person is ever presumed without proof to renounce any of the securities provided for him by law.

[Cited in The Illinois. Case No. 7,005; Southard v. Brady, 36 Fed. 561.]

In admiralty.

Mr. Jewell, for libellant.
Mr. Pike, for claimants.

WARE, District Judge. This is a libel in rem filed May 1, 1857, by Bela Hunting, et als. assignees of Charles B. Hunting, against the schooner H. B. Foster, for supplies of ship stores furnished by order of the master in the months of September, October, and November, 1856. The home port of the vessel at the time when the supplies were furnished, was Machias, in the state of Maine, and it appears from the proofs in the case that she was let by the owners to Robinson, the master, by a parol contract to be employed on shares, and that her actual employment was in the coasting trade between Machias and Boston, where the supplies were furnished. The general and well understood terms of this contract are, that the master is to victual and man the vessel at his own expense, is to have the entire control of her, and, after deducting certain port charges, pay one-half of the net earnings to the owners as the hire or charter of the ship. It is well settled by a series of decisions that, when by such a contract the possession and control of the vessel is transferred to the hirer; he becomes special owner and for the time she is employed under it, is liable as such; and that the general owners, the proprietors, are exempted from liability on the master's contract for repairs and supplies; and it makes no difference whether the hirer navigates the vessel himself as master or employs another person. Skolfield v. Potter [Case No. 12,925], and the authorities therein cited. But this does not affect the liability of the vessel. That always remains liable whoever may be the absolute owners.

The authority of the master to bind the ship itself by his contracts for supplies and repairs is a principle growing out of the necessities of maritime commerce, and was early incorporated into the maritime law as one of its original elements. The master has the management and control of the vessel, and she may be carried into port where neither he nor the owners are known, or if known, where they have not credit. His duty is to carry the ship on her voyage safely to her final port of destination. If she becomes in want of repairs and supplies to enable her to perform her voyage, these must be provided, and to procure them the master

always carries with him the credit of the ship itself. It is for her benefit that they are required, and on principles of natural justice she ought to pay for this indispensable viaticum. This is the view the maritime law takes of the case. Every person who makes such repairs and furnishes such supplies is considered as contracting with the vessel herself. The master binds himself, it is true, for it is his own contract, and he binds his owners, for he is their authorized agent; but the creditor may pass by both master and owners, as he has in this case, and proceed directly against the ship as the principal debtor for whose benefit the services were rendered. In the primitive maritime law there was in strictness no personal liability beyond that of the master. The owners would always exempt themselves from personal responsibility by abandoning their interest in the ship and freight as an appurtenance to the ship. The authority of the master extended no farther than to bind the property of the owners entrusted to his management. And such is now the law of all maritime nations on the continent of Europe. Ordonnance Louis 14, liv. 2, tit. 8, art. 2; 1 Valin, Commentary, p. 568; The Rebecca [Case No. 11,619], where the authorities are cited.

This view of the subject furnishes an answer to one of the positions of the claimant's counsel, that the liability of the ship continues only to the end of the voyage, for which the supplies were provided. If it is the proper debt of the ship, why is she not liable like any other debtor until the debt is paid? There is no statute of limitation raising a bar in the admiralty. Lapse of time indeed, connected with circumstances, will create an equitable bar. Every man is bound to use reasonable diligence in enforcing his rights. If he does not, and in the free and rapid circulation of property, he suffers other persons to acquire an interest in the subject matter without notice of his rights, the just penalty of such neglect may be the forfeiture of his rights, or postponement of them to the equitable claims of others. Ships, it is well known, are frequently changing owners; still more frequent are claims and rights against them for wages, repairs, and supplies. All such claims ought to be enforced in due season, and indeed promptly. and not be allowed to lie as secret liens and charges, which may operate as a surprise, if not a fraud on others. It is such considerations that have led able and learned admiralty judges to say that they will look narrowly into a lien claim of this kind if it is sought to be enforced at a later time than the termination of the voyage for which the supplies were furnished, and not because the claim then necessarily and legally becomes stale. The Utility [Id. 16,806]; The Boston [Id. 1,069].

But there is another view of the subject which requires consideration. The power

of the master extends no farther than to charge the vessel with such supplies as are necessary, that is, such as are suitable and proper. This is a power that is firmly sustained as indispensable for the purposes of navigation, but it is a power easily liable to abuse, and is therefore to be critically watched. The creditor is safe in trusting to the vessel only when the supplies are necessary, that is reasonably fit and proper, and in such amount as may fairly be supposed to be required for the vessel's use, and he is bound, as in case of bottomry, to use reasonable diligence to inform himself on this point. The reason for this requirement is the same in both cases, though perhaps it would be enforced with somewhat less stringency in the case of a simple maritime lien, than in one of bottomry with marine interest. Pratt v. Reed, 19 How. [60 U. S.] 359. If, therefore, the supplies furnished are not necessary, or if they are furnished in an amount beyond the needs of the ship; in the first case the ship will not be liable at all, and in the second not liable at least for the excess beyond her reasonable needs.

The necessity of such supplies and provisions as are the subject of this suit cannot be questioned. But there was a suggestion at the argument that the amount was greater than was required for the consumption of the crew. The vessel was trading between Boston and her home port, Machias, where the family of the master resided, and she would naturally be expected to procure a part of her supplies there. But even on that supposition, I do not think that the amount charged is such as would awaken in the mind of the creditor, who furnished them, a suspicion that the master was procuring provisions for other purposes than that of feeding his crew. But then we have the direct testimony of the master himself, that a considerable portion of these supplies were actually carried home to his family, and not used in the vessel. If that had been known at the time to Hunting, or if he had reasonable grounds to believe from the amount furnished, or other circumstances that such was the fact, it would, I think, have been a fatal bar to this suit. It would be a credit not authorized by law and a fraud on the vessel, for that is liable only for what is for her own use. But if they were originally furnished in good faith for the vessel's use, the creditor is not answerable for a misapplication by the master to which he was not a party. To justify a loan on bottomry there must be an apparent necessity, and the loan must be made in good faith to relieve that necessity, but the lender is not affected by the master's misapplication of the money. Emerigon, Contrâts a la Grosse, c. 4, § 8. Admitting, then, that the supplies were thus misapplied by the master in this case, if it was without the knowledge and consent of the creditor, it ought not to affect his claim. But it is strongly urged that these supplies were furnished under a special agreement on the personal credit of the master alone. This is directly and positively sworn to by the master, and if so, it makes an end to this case. Modus et conventio vincunt legem. But it is as positively and directly denied by Hunting. It requires some charity to enable one to believe that both these witnesses have sworn fairly; that there was not intentional falsehood in one or the other. The only other explanation of the contradiction that I can imagine is that there was a conversation on the subject between the parties without their coming to mutual understanding and agreement; that the master ordered the supplies, intending that the charge should be to him personally, but that Hunting, not having consented to it, charged them to the vessel according to his usual practice. This agreement or conversation took place in the month of June. Between June and September the vessel made three trips, and in each case supplies were obtained of Hunting. Bills of parcels were delivered with the goods charged, as the bills in this case, against the ship and owners. They have been all paid without objection to the manner in which they were charged. The supplies for which this suit is brought were charged in the same manner, and bills of parcels delivered with the goods, and no objection made by the master. Whatever his original intention may have been as to procuring his supplies on his own personal credit, he must be held to have abandoned them. Hunting says that he would not have furnished them on the master's credit alone, and a creditor is never presumed without proof to abandon any of the securities the law gives him. My opinion on the whole evidence is that the libellant is entitled to a decree in his favor. Decree $69.00 and costs.